FILED

14 AUG 11  PM 4: 16

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY:                          DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOROTHY DURBIN,<br><br>                                   Plaintiff,<br>vs.<br><br>HARTFORD LIFE INSURANCE COMPANY; and DOES 1 through 10,<br><br>                                   Defendants. | CASE NO. 13CV52 BEN (JLB)<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br>[Docket No. 30] |

Before the Court is a Motion for Summary Judgment or Partial Summary Judgment filed by Defendant Hartford Life Insurance Company's ("Hartford"). (Docket No. 30.)  For the reasons stated below, the Motion is **GRANTED**.

## BACKGROUND

Except where otherwise noted, the following facts are undisputed.  In 1988, Plaintiff Dorothy Durbin purchased a single-premium adjustable life insurance policy ("the Policy") from Pacific Standard Life Insurance Company ("Pacific Standard"). (Pl.'s Opp'n to Mot. for Summ. J. ("Pl.'s Opp'n") 2; Def.'s Mot. for Summ. J. ("Def.'s Mot.") 1.)  The Policy issued for a one-time payment of $100,000 and had a face value of $326,000. (Pl.'s Opp'n 2, Craig Miller Decl. ("Miller Decl.") ¶ 2, Ex. 1; Def.'s Mot. 2.)  The Policy was purchased through a relative, Gary Jenkins. (Pl.'s Opp'n 2; Def.'s Mot. 2-3.)  Hartford assumed Pacific Standard's contractual obligations under the Policy on May 11, 1994. (Notice of Removal, Ex. A [Compl.], Ex. B ("Certificate of

1    Assumption").)

2           The Policy's terms allow Durbin to borrow funds against it, using the Policy as

3    collateral. (Miller Decl. ¶ 2, Ex.1; Def.'s Mot. 3.)  On October 3, 1990 and April 28,

4    1992, Pacific Standard issued loans against the Policy ("Loan 1" and "Loan 2"). (Pl.'s

5    Opp'n 2; Def.'s Mot. 3.)   Loan 1 and Loan 2 were in the principal amounts of

6    $9,274.17 and $8,894.00, respectively. (Pl.'s Opp'n 2; Def.'s Mot. 3.) Hartford issued

7    a third loan ("Loan 3") in the amount of $30,000.00 on October 13, 1997. (Pl.'s Opp'n

8    2; Def.'s Mot. 3.)

9           Information about the loans was sent to Durbin at her residence.  Durbin recalled

10   receiving the checks for Loans 1 and 2 and sending them to Jenkins. (Miller Decl., Ex.

11   9 [Dorothy Durbin's July 28, 2011 Statement].)[1]  Annual statements reflecting the

12   outstanding loan balances were sent to Durbin's home from 1995-1997, 2002-2004,

13   and 2008-2012.  (Def.'s Mot., Kari Clasen Decl. ("Clasen Decl."), ¶¶ 4-5, Ex. A.)

14   Additionally, loan payment notices which stated the amount of interest due on the loans

15   were sent to Durbin at her home in at least 1997, 2003, and 2005. (*Id.* at ¶¶ 6-7, Ex.

16   B.)[2]  In addition, Durbin's son, Richard Durbin, testified that Durbin was upset about

17   loan payment notices she received sometime before 2007 because she did not generally

18   borrow money. (Def.'s Mot., Michael Barnes Decl. ("Barnes Decl.") ¶ 2, Ex. A at 19-

19   25, 39-40.)

20          In early 2009, Durbin learned that Jenkins had been arrested and charged with

21   defrauding an elderly couple. (Pl.'s Opp'n 3; Def.'s Mot. 5.)  Upon review of her life

22   insurance statements from Hartford, Durbin took note of the three loans against the

23

24          [1]At oral argument, Durbin's counsel suggested Durbin's receipt of the check for
     the second loan was disputed.   (June 30, 2014 Hearing Tr. 8:4-5.)   In opposing
25   Hartford's motion, Durbin does not put forth any evidence that she did not receive the
     second loan check and her signed statement, upon which both parties rely, indicates
26   that she received both checks and gave them to Jenkins. (Miller Decl., Ex. 9.)

27          [2]The record reflects that additional annual statements were sent to Durbin at an
     address associated with Jenkins for certain periods of time. Although not entirely clear,
28   it appears that this occurred as to some time periods at Durbin's request and as to other
     periods of time at Jenkins' request.

1  Policy. (Pl.'s Opp'n 3; Def.'s Mot. 5.)  On May 7, 2009, Durbin notified Hartford by
2  phone that she thought Jenkins took her money through the loans. (Miller Decl., Ex.
3  4.)

4       Hartford conducted an investigation. (Pl.'s Opp'n 3-8; Def.'s Mot. 6.)  Hartford
5  assigned the case to Brian Erickson in its Investigations Unit. (Pl.'s Opp'n 3; Def.'s
6  Mot. 6.)  Erickson interviewed Durbin, Jenkins, Jenkins' wife, and Jenkins' former
7  assistant. (Def.'s Mot. 6; Pl.'s Opp'n 4-7.)  Based on his investigation, Erickson
8  opined that there was credible evidence to support Durbin's claim that she did not
9  request or receive the proceeds of the loans, and that he thought that "Durbin most
10 likely did not" receive the loans. (Miller Decl. ¶ 8, Ex. 7.)  He also indicated he was
11 unable to determine who did receive the loan proceeds.  (*Id.*)  The facts concerning
12 Erickson's investigation and his opinions are undisputed.  It is the significance of his
13 opinions that the parties dispute.

14      On July 28, 2011, Durbin asked Hartford to put "my policy back to what it was
15 before the loans were taken." (Miller Decl., Ex. 8.)  On October 28, 2011, Hartford
16 offered to pay off Loan 3, which at that time, including interest, totaled $79,026.78, in
17 exchange for a release of liability with regard to all three loans.  (*Id.*, Ex. 10.)
18 Following multiple extensions of the deadline to accept the offer, the offer was
19 withdrawn on June 29, 2012. (*Id.*, Ex. 15.)

20      On November 13, 2012, Durbin filed suit in San Diego County Superior Court
21 against Hartford.  (Notice of Removal, Ex. A [Compl.].)  The complaint alleges: (1)
22 breach of contract, (2) breach of the implied covenant of good faith and fair dealing,
23 and (3) financial elder abuse.  (*Id.*)  Hartford removed the action to this Court on
24 January 9, 2013. (*Id.*) Hartford subsequently joined Jenkins as a third-party defendant.
25 (Docket No. 14).

26                          **LEGAL STANDARD**

27      Summary judgment is appropriate when "there is no genuine dispute as to any
28 material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV.

1   P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  In

2   considering a summary judgment motion, a court examines the evidence in the light

3   most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654,

4   655 (1962).

5       A moving party bears the initial burden of showing there are no genuine issues

6   of material fact. *Horphag Research Ltd. v. Garcia,* 475 F.3d 1029, 1035 (9th Cir.

7   2007) (citing *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630

8   (9th Cir. 1987)).  The moving party can do so by negating an essential element of the

9   non-moving party's case, or by showing that the non-moving party failed to make a

10  showing sufficient to establish an element essential to that party's case, and on which

11  the party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett,* 477 U.S. 317,

12  331 (1986). The burden then shifts to the non-moving party to show that there is a

13  genuine issue for trial. *Horphag Research Ltd.,* 475 F.3d at 1035.

14      "Only disputes over facts that might affect the outcome of the suit under the

15  governing law will properly preclude the entry of summary judgment. Factual disputes

16  that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.  As

17  a general rule, the "mere existence of a scintilla of evidence" will be insufficient to

18  raise a genuine issue of material fact; there must be evidence on which the jury could

19  reasonably find for the non-moving party. *Id.* at 252. "Summary judgment procedure

20  is properly regarded not as a disfavored procedural shortcut, but rather as an integral

21  part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and

22  inexpensive determination of every action.'" *Celotex Corp.,* 477 U.S. at 327 (quoting

23  FED. R. CIV. P. 1).

24                              **DISCUSSION**

25      As noted above, the facts of this case are largely undisputed and the few facts

26  that are in dispute are not material.  The real dispute in this case, and the issue this

27  Court must resolve, is when Durbin's claims accrued.  In moving for summary

28  judgment, Hartford argues that Durbin's claims are barred by the applicable statutes of

1   limitation because her claims are based on loans issued in 1990, 1992, and 1997, and
2   Durbin did not file this action until 2012. Durbin argues that her claims are not based
3   on the issuance of the loans, but rather on Hartford's refusal, in 2011-2012, to repay
4   the loans.

5        As discussed in more detail below, the Court finds Durbin's claims are barred
6   by the statutes of limitation. Despite Durbin's efforts to characterize her claims as
7   arising in 2011-2012, her claims arose when each of the allegedly unauthorized loans
8   was issued.[3] Hartford's offer to repay only the third loan and the eventual withdrawal
9   of that offer does not trigger a new statute of limitations.

10        Additionally, even if Durbin's claims were independently based on Hartford's
11   2011-2012 conduct, the claims would fail. Hartford had no obligation to repay the
12   loans in 2011-2012 because any claim based on the issuance of the loans was time-
13   barred. Refusing to pay a time-barred claim is not a breach of either the Policy or the
14   covenant of good faith and fair dealing, and is also not a violation of the financial elder
15   abuse statute.

16   **I.   Statutes of Limitation**

17        **A.   Policy Underlying Statutes of Limitation**

18        Statutes of limitation are neither favored or disfavored by the courts and exist to
19   "protect defendants from the stale claims of dilatory plaintiffs" and "to stimulate
20   plaintiffs to assert fresh claims against defendants in a diligent fashion." *Norgart v.*
21   *Upjohn Co.*, 21 Cal. 4th 383, 395 (1999). "The purpose of statutes of limitation is to
22   promote justice by preventing surprises through the revival of claims that have been
23   allowed to slumber until evidence has been lost, memories have faded, and witnesses
24   have disappeared." *Cutujian v. Benedict Hills Estates Ass'n*, 41 Cal. App. 4th 1379,

25

26        [3]The Court notes that the loans were *allegedly* unauthorized by Durbin because
   this fact is disputed. However, it is not material for purposes of the statutes of
27   limitation. *See Anderson*, 477 U.S. 248 ("Only disputes over facts that might affect the
   outcome of the suit under the governing law will properly preclude the entry of
28   summary judgment."). Durbin asserts that the loans were unauthorized, but whether
   the loans were unauthorized or not, her claims are barred by the statutes of limitation.

1   1387 (2d Dist. 1996); *see also Mo., Kan. & Tex. Ry. Co. v. Harriman Bros.*, 227 U.S.
2   657, 672 (1913) ("The policy of statutes of limitation is to encourage promptness in the
3   bringing of actions, that the parties shall not suffer by loss of evidence from death or
4   disappearance of witnesses, destruction of documents, or failure of memory.").

5          Here, memories have faded, a witness is missing, and documents have been lost.
6   Durbin's memory has faded.  She did not recall the factual basis for her claims in this
7   action during her deposition.   She denied that she wrote the premium checks to
8   purchase the Policy, denied that any loans have ever been taken against the Policy, and
9   denied that she communicated with Hartford about any alleged wrongdoing by Jenkins.
10  (Barnes Decl., Ex. B, at 37-38, 41, 81-82.)   Additionally, Durbin's counsel
11  acknowledged at oral argument that his client now suffers from dementia. (June 30,
12  2014 Hearing Tr. 5:15-17.)

13         Further, witnesses are unavailable and documents have been lost.  Hartford's
14  investigators were unable to locate and interview Kim Jones, who was Jenkins'
15  assistant at the time the loans were taken out.  The checks with the allegedly forged
16  endorsements are also no longer available. Hartford's investigator attempted, but was
17  unable, to locate the checks. (*Id.* at 12:2-10; Miller Decl., Ex. 10.) Durbin's counsel
18  noted at oral argument that Durbin did not have the checks. (June 30, 2014 Hearing
19  Tr. 7:12-15.) These practical problems illustrate the purpose and need for statutes of
20  limitation. Relevant and important evidence has been lost in the twenty years since the
21  first loan was issued.

22         Additionally, even if all the evidence were fresh and available, the statutes of
23  limitation must still be applied.  During oral argument, Durbin's counsel attempted to
24  minimize the significance of this missing evidence and suggested that she should not
25  be precluded from pursuing her claims because this evidence, the checks in particular,
26  might have been lost within days of being issued. (*Id.* at 40:12-16.) However, statutes
27  of limitation are not applied "flexibly on a case-by-case basis." *Norgart*, 21 Cal. 4th
28  at 395.

13cv52

1  They "operate[] conclusively across the board." *Id.* As the *Norgart* court explained,

> a cause of action brought by a plaintiff within the limitations
> period applicable thereto is not barred, even if, in fact, the former
> is stale and the latter dilatory; contrariwise, a cause of action
> brought by a plaintiff outside such period is barred, even if, in fact,
> the former is fresh and the latter diligent.

*Id.* Here, not only is the policy behind statutes of limitation illustrated by the state of the available evidence, but, as explained below, each claim was brought outside the applicable limitations period.

### B.   Accrual of Statutes of Limitation

"[T]he statute of limitations commences when a party knows or should know the *facts* essential to his claim." *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1143 (4th Dist. 1990) (emphasis in original to distinguish knowledge of facts from legal theories or remedies which are not necessary for accrual of the claim) (citing *Gutierrez v. Mofid*, 39 Cal. 3d 892, 894-98 (1985)). A claim accrues, *i.e.* the statute of limitations begins to run, when the "wrongful act is done or the wrongful result occurs." *Norgart*, 21 Cal. 4th at 397 (internal quotes omitted). A defendant bears the burden of establishing that a claim is time-barred. *Cal. Sansome Co. v. Gypsum*, 55 F.3d 1402, 1406 (9th Cir. 1995) (citing *Permanente Med. Grp./Kaiser Found. Hosp. v. Workers' Comp. Appeals Bd.*, 171 Cal. App. 3d 1171, 1178 (3d Dist. 1985)).

Under the "discovery rule," accrual may be postponed until the plaintiff "either discovers, or has reason to discover" the basis for a claim. *Soliman v. Philip Morris Inc.*, 311 F.3d 966, 971 (9th Cir. 2002) (citing *Norgart*, 21 Cal. 4th at 397). It is only delayed until the plaintiff "at least suspects that someone has done something wrong to him." *Id.* at 971-72 (quoting *Jolly*, 44 Cal. 3d at 1110). However, accrual is not delayed until the plaintiff knows all "the specific facts necessary to establish a [claim]." *Id.* (quoting *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1111 (1988)). Nor is it delayed until "the plaintiff[] suspects facts supporting each specific legal element of a particular cause of action." *Fox v. Ethion Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005). A

13cv52

1    plaintiff bears the burden of establishing that the discovery rule delays accrual of the
2    plaintiff's claim. *Cal. Sansome Co.*, 55 F.3d at 1406.
3    **II.    Breach of Contract**
4         Durbin argues that Hartford breached the Policy in 2012 by reducing the value
5    of her Policy by the amounts of the allegedly unauthorized loans and associated interest
6    when it knew that she did not request or receive the proceeds of the loans.  Durbin
7    identifies Hartford's June 29, 2012 letter withdrawing its previous offer as the point
8    when her breach of contract claim arose.  Hartford argues that any claim Durbin had
9    for breach of the Policy occurred when the loans were issued.
10        **A.    Accrual**
11        The parties both point the Court to the "primary rights doctrine" to determine
12   whether Durbin's claims arose when the loans were issued in the 1990s, or when
13   Hartford refused to repay the loans in full in 2012.  Although generally applied to
14   determine which statute of limitations applies, it is instructive here.  Under the
15   doctrine, "the essence of a cause of action is the invasion of a plaintiff's primary right,
16   not the number of acts or omissions that constitute the invasion." *McCoy v. Gustafson*,
17   180 Cal. App. 4th 56, 75-76 (6th Dist. 2009); *see also Barton v. New United Motor*
18   *Mfg.*, 43 Cal. App. 4th 1200, 1207 (1st Dist. 1996) ("What is significant for statute of
19   limitations purposes is the primary interest invaded by defendant's wrongful
20   conduct.").
21        The Court finds that the basis of Durbin's breach of contract claim is the
22   allegedly unauthorized issuance of the loans.  Any harm Durbin suffered, *i.e.* the
23   issuance of the loans against her Policy without her authorization, happened when the
24   loans were issued.
25        At best, Hartford's refusal to repay all of the loans is an additional harm resulting
26   from the earlier breach.  "'If the statute of limitations bars an action based upon harm
27   immediately caused by defendant's wrongdoing, a separate cause of action based on
28   a subsequent harm arising from the wrongdoing' is normally barred." *Soliman*, 311

1  F.3d at 972 (quoting *Miller v. Lakeside Vill. Condo. Ass'n*, 1 Cal. App. 4th 1611, 1622
2  (2d Dist. 1991)). Here, as explained below, a claim based on the issuance of the loans
3  without Durbin's authorization is barred by the statute of limitations. The subsequent
4  harm, Hartford's refusal to repay all three loans, arises from the same wrongdoing.

5      Additionally, even if the Court found that Hartford's withdrawal of its offer to
6  repay Loan 3 in exchange for a release of liability for all three loans could be a separate
7  breach of the Policy, the breach of contract claim would still fail. Hartford had no
8  obligation to repay the loans. As discussed in more detail below, a claim based on the
9  issuance of the loans without Durbin's authorization is time-barred. Refusing to pay
10  a time-barred claim is not a breach of the Policy.

11      **B.    Four-Year Statute of Limitations**

12      The statute of limitations for an action upon a written contract, such as an
13  insurance policy, is four years. CAL. CIV. PROC. CODE § 337. "[A] cause of action for
14  breach of contract ordinarily accrues at the time of breach." *Menefee v. Ostawari*, 228
15  Cal. App. 3d 239, 244 (1st Dist. 1991).

16      Because any breach of the Policy occurred when the loans were issued, the claim
17  is barred by the four-year statute of limitations. It is undisputed that the loans were
18  issued in 1990, 1992, and 1997. Absent delayed accrual under the discovery rule, the
19  statute of limitations ran in 1994, 1996, and 2001, respectively, more than ten years
20  before Durbin filed this action in 2012.

21      **C.    Discovery Rule**

22      Although Durbin did not argue for application of the discovery rule to delay the
23  accrual of her claim,[4] the Court finds that Durbin "discovere[d] or had reason to
24  discover" the basis for her breach of contact claim as to Loans 1 and 2 shortly after
25

26      [4]In moving for summary judgment, Hartford anticipated that Durbin would argue
27  for application of the discovery rule. Durbin did not argue that the discovery rule
applied or outline the basis for any delayed discovery of the loans. Although the Court
28  has analyzed its application based on the evidence before the Court, Durbin has not met
her burden on this issue and cannot not benefit from application of the rule. *See Cal.
Sansome Co.*, 55 F.3d at 1406.

1  each was issued, and as to Loan 3 in 2002. *See Soliman*, 311 F.3d at 971 (citing
2  *Norgart*, 21 Cal. 4th at 397).

3      Durbin received the checks for Loans 1 and 2 at her home. (Miller Decl., Ex. 9.)
4  Given that she asserts that she never authorized any loans being issued against her
5  Policy, receiving the two loan checks was sufficient for Durbin to "at least suspect that
6  someone ha[d] do[ne] something wrong to [her]." *Id.* at 971-72 (quoting *Jolly*, 44 Cal.
7  3d at 1110). As to Loan 3, Durbin received an annual statement at her home in 2002
8  that included amounts owed for all three loans. (Clasen Decl., ¶¶ 4-5, Ex. A.)

9      Even if the Court found that the loan checks and the 2002 annual statement did
10  not give Durbin "reason to discover" the basis for her claim, Durbin had reason to
11  discover the loans numerous times in the following years. *See Soliman*, 311 F.3d at
12  971. Annual statements were sent to her at her home in 1995, 1996, 1997, 2002, 2003,
13  2004, 2008, and beyond. (Clasen Decl., ¶¶ 4-5, Ex. A.) Payment notices, reflecting the
14  interest due on the loans, were also sent to Durbin at her home in 1997, 2003, and
15  2005. (*Id.* at ¶¶ 6-7, Ex. B.) Additionally, Durbin was upset about the loan notices she
16  was receiving no later than 2004.[5] Giving her every benefit of the doubt, the statue of
17  limitations on her breach of contract claim still expired in 2008, four years before this
18  action was filed. Durbin's breach of contract claim is barred by the four-year statute
19  of limitations.

20  **III.   Covenant of Good Faith and Fair Dealing**

21      Durbin argues that her claim for breach of the covenant of good faith and fair
22  dealing did not arise until Hartford offered to repay Loan 3, including interest, in
23  exchange for a release from liability for all three loans in Hartford's October 28, 2011
24  letter. Like the breach of contract claim, Hartford argues that any claim Durbin has for

25

26      [5]Durbin's son testified that Durbin was upset about loan payment notices she was
27  receiving before Jenkins was arrested in 2007. This could only be the notices sent to
    her in the 2002-2004 time frame when she was receiving the notices at her home.
28  (Barnes Decl. ¶ 2, Ex. A at 19-25, 39-40.; *see also* June 30, 2014 Hearing Tr. 9:22-25
    (Durbin's counsel acknowledges she was concerned about the payment notices in 2002
    or 2004).)

13cv52

1    breach of the covenant of good faith and fair dealing occurred when the loans were

2    issued.

3         The analysis applicable to Durbin's breach of contract claim is equally

4    applicable to her claim for breach of the covenant of good faith and fair dealing.

5    Hartford's offer to repay the only loan it issued in exchange for a release of liability for

6    all three loans is a "subsequent harm arising from" the earlier wrongdoing. *Soliman*,

7    311 F.3d at 972. Because the earlier wrongdoing, allegedly issuing the loans without

8    Durbin's authorization, is barred by the statue of limitations, a claim based on the

9    subsequent harm is as well. *Id.*

10        As with Durbin's breach of contract claim, giving Durbin the benefit of the

11    discovery rule, any claim Durbin had accrued in 1990, 1992, and 2002 based on Loans

12    1, 2, and 3, respectively. Durbin's claim for breach of the covenant of good faith and

13    fair dealing was barred by the statute of limitations two years earlier than her breach

14    of contract claim. The statute of limitations for breach of the covenant of good faith

15    and fair dealing is two years, rather than four years. CAL. CIV. PROC. CODE § 339. The

16    Court only provides analysis of two additional points specific to this claim.

17        Putting aside the statute of limitations, it is not a breach of the covenant of good

18    faith and fair dealing for Hartford to offer to repay the loan it issued, Loan 3, and refuse

19    to repay loans it took no part in issuing, Loans 1 and 2. "The linchpin of a bad faith

20    claim is that the denial of coverage was *unreasonable*." *See Trishan Air, Inc. v. Fed.*

21    *Ins. Co.*, 635 F.3d 422, 434 (9th Cir. 2011) (emphasis added). Hartford has a

22    reasonable claim that it is not liable for Loans 1 and 2 because it only assumed contract

23    liabilities from Pacific Standard. (Def.'s Mot., Karen Melhorn Decl., Ex A [Agreement

24    and Plan of Rehabilitation in Connection with the Rehabilitation of Pacific Standard].)

25    The Court need not resolve whether the allegedly unauthorized loans constitute

26    contract liabilities, which Hartford assumed, or retained liabilities, which it did not.

27    (*Id.*) It is sufficient that Hartford could reasonably deny repayment of Loans 1 and 2

28    on this basis without acting in bad faith. *See Griffin Dewatering Corp. v. N. Ins. Co.*

13cv52

1  *of N.Y.*, 176 Cal. App. 4th 172, 207 (4th Dist. 2009) (finding an insurer can take a legal
2  position benefitting its own interest, contrary to its insured's position on a matter of
3  contract interpretation without acting in bad faith).

4        Additionally, like Durbin's breach of contract claim, this claim would fail even
5  if based on Hartford's October 28, 2011 letter. Hartford had no obligation to repay any
6  of the loans because any claim based on them was barred by the statutes of limitation.
7  Hartford did not violate the covenant of good faith and fair dealing by requiring a
8  release of liability for two time-barred claims, repayment of Loans 1 and 2, in exchange
9  for repaying another time-barred claim, repayment of Loan 3.

10  **IV.   Financial Elder Abuse**

11        Like Durbin's claim for breach of the covenant of good faith and fair dealing,
12  she argues her financial elder abuse claim did not accrue until October 28, 2011, when
13  Hartford offered to repay only Loan 3 and failed to offer to repay the value of Loans
14  1 and 2. As with the prior claims, Hartford argues that any violation of the financial
15  elder abuse statute occurred when the loans were issued.

16        Durbin asserts that the financial elder abuse claim did not accrue until *Hartford*
17  discovered the loans were unauthorized and did not repay the loans. The financial
18  elder abuse statute prohibits "retaining . . . personal property of an elder for a wrongful
19  use." CAL. WELF. & INST. CODE § 15610.30(a)(1). Property is taken for a wrongful
20  use when the "entity . . . retains the property and the . . . entity *knew or should have*
21  *known* that this conduct is likely to be harmful to the elder." CAL. WELF. & INST. CODE
22  § 15610.30(b) (emphasis added). Durbin asserts that Hartford did not know that its
23  conduct was likely to be harmful to Durbin until Erickson investigated the loans and
24  Hartford did not retain Durbin's property for a wrongful purpose until Hartford offered
25  to repay only Loan 3 in the October 28, 2011 letter.

26        It is not clear whether Hartford ever determined the loans were unauthorized
27  based on one investigator's opinion that Durbin most likely did not receive the loans.
28  Even if the Court assumes that Hartford determined that the loans were unauthorized

13cv52

1    as Durbin claims, this argument fails for three reasons.

2        First, Hartford did not retain Durbin's property, *i.e.* the value of the loans. As

3 explained with regard to the breach of contract and breach of the covenant of good

4 faith and fair dealing claims, Hartford was not obligated to repay the loans because any

5 claim based on the loans being issued without her authorization was barred by the

6 statute of limitations.

7        Second, to accept Durbin's theory would create a reverse discovery rule. By her

8 logic, the financial elder abuse was not committed until *Hartford* discovered the loans

9 were unauthorized and refused to repay all three with interest. This would be a

10 particularly troubling approach in this case because Durbin was the only one in a

11 position to know the loans were issued without her authorization, and she failed to

12 bring it to Hartford's attention for almost twenty years. Allowing this theory of relief

13 to proceed also completely eviscerates the purpose of statutes of limitation. *Cutujian*,

14 41 Cal. App. 4th at 1387 ("The purpose of statutes of limitations is . . . preventing

15 surprises through the revival of claims that have been allowed to slumber until

16 evidence has been lost, memories have faded, and witnesses have disappeared."). A

17 plaintiff could simply take out loans against her policy, use the proceeds, and then wait

18 until evidence of the events (cancelled checks with valid signature and witnesses that

19 remember relevant events) is gone, much like it is here. Then, the plaintiff could claim

20 the loans were unauthorized, demand repayment, and sue the insurance company for

21 financial elder abuse if it failed to repay in full.

22        Third, the statute of limitations for a claim for financial elder abuse

23 "commence[s] within four years after the plaintiff discovers or, through the exercise

24 of reasonable diligence, should have discovered, the facts constituting financial elder

25 abuse." CAL. WELF. & INST. CODE § 15657.7. The "facts constituting financial elder

26 abuse" that Durbin "should have discovered" if acting with "reasonable diligence"

27 were the issuance of the loans she claims she did not authorize in the 1990s. *Id.*

28 ///

13cv52

1

**CONCLUSION**

2       For the reasons stated above, Hartford's motion for summary judgment is

3 **GRANTED**.

4       **IT IS SO ORDERED.**

5

6 DATED: August ___, 2014

7                           HON. ROGER T. BENITEZ

                             United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

13cv52